| | |
|---|---|
| Amee Pribyl,<br><br>       Plaintiff,<br><br>v.<br><br>County of Wright, and Wright County Sheriff's Department,[1]<br><br>       Defendants. | Case No. 17-cr-0854 (SRN/HB)<br><br><br>**MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Kelly A. Jeanetta, Kelly A. Jeanetta Law Firm, LLC, 402 Union Plaza, 333 Washington Avenue North, Minneapolis, MN 55401; Christy L. Hall, Gender Justice, 550 Rice Street, St. Paul, Minnesota 55103, for Plaintiff.

Dyan J. Ebert and Cally R. Kjellberg-Nelson, Quinlivan & Hughes, P.A., PO Box 1008 St. Cloud, MN 56302, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendant Wright County's Motion for Summary

Judgment [Doc. No. 29].   Plaintiff Amee Pribyl opposes the motion and has filed a

---

[1] County of Wright ("Wright County" or "the County") contends that the correct name for its co-defendant in this suit is the Wright County Sheriff's Office ("Sheriff's Office"). (Def.'s Mem. Supp. Mot. for Summ. J. at 1 n.1 [Doc. No. 31].)  However, because the Sheriff's Office is not a legal entity subject to suit, the claims against it are dismissed. S*ee In re Scott Cnty. Master Docket*, 672 F. Supp. 1152, 1163 n.1 (D. Minn. 1987) (dismissing claims against sheriff's department because it was not a legal entity subject to suit), *aff'd Myers v. Scott Cnty.*, 868 F.2d 1017 (8th Cir. 1989).

response. [Doc. No. 38]. The Court heard oral argument on June 15, 2018 and the parties subsequently filed supplemental memoranda [Doc. Nos. 48 & 49]. Based on a review of the file, record and proceedings therein, and for the reasons set forth below, the Court grants Defendant's motion.

## II.   BACKGROUND

### A. Factual Background.

#### 1.   Plaintiff Work History and Educational Background

Plaintiff, who is female, has been employed in law enforcement for over twenty years. In September 1996, the Wright County Sheriff's Office hired her as a deputy, starting in the Patrol Division. (Kjellberg-Nelson Aff. [Doc. No. 32] , Ex. B (Pribyl Dep. at 11–12).)[2] In August 1997, and again in August 1998, Pribyl applied to be a member of the Major Crimes Investigation Unit but was not selected. (*Id.* at 25–27.) After reapplying in May 1999, she successfully became a member of the Major Crimes Investigation Unit, (*id.*), where she remained until February 2005. (Jeanetta Aff. [Doc. No. 39], Ex. E (Hoffman Dep., Ex. 6 at WC-1282).) In April 2004, Plaintiff began working for the Sheriff's Office's Court & Judicial Security Division. (*Id.*) Her job duties included maintaining order and providing general security in the courtrooms, judicial corridors, and public spaces. (*Id.*) In this role, Pribyl also developed a Court Security Safety Plan and a Court Security Alarm Testing Plan. (Jeanetta Aff., Ex. D (Pribyl Dep. at 41–43.) She

---

[2] Unless otherwise noted, all citations to the record refer to exhibits attached to the Affidavit of Cally R. Kjellberg-Larson in Support of Defendant's Motion for Summary Judgment [Doc. No. 32] and the Affidavit of Kelly A. Jeanetta in Opposition to Summary Judgment [Doc. No. 39].

testified that both were implemented and continue to be utilized by Court Security, although they were not approved by the County Board. (*Id.*)

Pribyl earned a bachelor's degree in Criminal Justice from St. Cloud State University in 1995. (Kjellberg-Nelson Aff., Ex. A (Pl.'s Interrog. Ans., No. 2).) In 2010, she received a master's degree in Criminal Justice Leadership from Concordia University. (*Id.*) Between 2011 and 2014, Plaintiff also earned four certificates pertaining to court security from Columbian Southern University and the National Sheriff's Association, including a "Master of Court Security" certificate. (*Id.*)

### 2. 2014 Promotional Opportunity at Issue

In July 2014, a sergeant position opened within the Court Services department. (Kjellberg-Nelson Aff., Ex. H (Job Posting for Sergeant Position at WC-1199).) The position was first offered to other sergeants, but none were interested. (Jeanetta Aff., Ex. B (Hoffman Dep. at 37).) The position was then made available to all Wright County Deputies. (*Id.* at 38.) Plaintiff applied and was invited to interview for the position. (Kjellberg-Nelson Aff., Ex. G (email re: Sergeant Position at WC-2547).) The job posting listed several minimum qualifications for the role, including the requirement that each applicant have an associate's degree in criminal justice or law enforcement. (*Id.*, Ex. H (Job Posting for Sergeant Position at WC-1199).) Each of the 19 deputies who ultimately applied for the position, including Plaintiff, met these minimum qualifications. (Jeanetta Aff., Ex. G (Hoffman Dep., Ex. 2 at 102–03).) Of the 19 deputies who interviewed for the position, two were female. (*Id.*)

Applicants applied for the position through "NeoGov," a software program that screens internal and external candidates who apply for jobs with Wright County. (Jeanetta

Aff., Ex. B (Hoffman Dep. at 28).) NeoGov determined whether each applicant "passed," or met the minimum qualifications for the job, making them eligible for an interview. (*Id.* at 33–34.) Plaintiff's application received a percentage score of 86.96%. (Jeanetta Aff., Ex. G (Hoffman Dep., Ex. 2 at 102).) Drew Scherber, who was ultimately promoted to the sergeant position at issue, received a percentage score of 52.17% on his NeoGov application. (*Id.* at 103.) These percentages were not used in the evaluation of each individual candidate, nor were the candidates ranked based on the percentages. (Jeanetta Aff., Ex. B (Hoffman Dep. at 33–35).)

Each candidate for the Sergeant position was interviewed by a panel of Wright County employees including Judy Brown, a Human Resources Representative; Chief Deputy Todd Hoffman (at the time, a Captain); and Captain Dan Anselment. (*Id.* at 27–28.) One candidate was interviewed on August 19, 2014; Plaintiff and eleven other candidates were interviewed on August 21, 2014; and six more candidates were interviewed on August 28, 2014. (Kjellberg-Nelson Aff., Ex. I (Interview Schedule at WC-1212).) The panel asked every candidate the same set of initial questions. (*Id.*, Ex. F (Hoffman Dep. at 67).) Each interview was scheduled to last 20 minutes, (*id.*, Ex. I (Interview Schedule at WC-1212)), although the time limitation was flexible, and interviewees were not cut off during their interviews due to time constraints. (*Id.*, Ex. F (Hoffman Dep. at 67).)

In his deposition, Chief Deputy Hoffman testified that he evaluated each candidate's communication skills, thought processes, articulation, and overall presentation during each interview. (*Id.* at 71–72.) He further testified that while Human Resources directed the panel to take notes on exactly how each candidate answered each question, he did not make a

notation of every single aspect of each interview, focusing instead on key elements of each interview that made a candidate "stand out," positively or negatively. (*Id.* at 67–70, 82, 93.)

### 3. Plaintiff's Interview Performance

Pribyl interviewed for the Sergeant position on August 21, 2014. (Kjellberg-Nelson Aff., Ex. I (Interview Schedule).) Each interviewer noted that in response to questions about ethics and the guiding principles that peace officers should follow, Pribyl stressed the importance of honesty, communication skills, and setting a good example. (Jeanetta Aff., Ex. J (Interview Notes at WC-0213–18).) These themes were similarly expressed in other interviews, including the interview of Drew Scherber. (*Id.* at WC-0235–38.) Chief Deputy Hoffman testified in his deposition that Plaintiff's answers were "very short and to the point," almost as if her answers were "coming from a textbook." (Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 85, 93).) Hoffman expressed concern that Plaintiff's answers lacked depth and did not reflect Plaintiff's stated experience and education. (*Id.* at 91.) In one instance, Plaintiff was asked to describe the Sheriff's Office mission statement in her own words and explain how, as a sergeant, she would carry out and improve the mission. (*Id.* at 84.) Hoffman found it concerning that Plaintiff recited the mission statement verbatim; he wanted to hear what the mission statement meant to Plaintiff and how she planned to communicate that message to her subordinates, if hired for this position. (*Id.*) Both Hoffman and Anselment noted in their interview notes that in addition to reciting the mission statement, Plaintiff stressed the importance of setting a good example. (Jeanetta Aff., Ex. J (Interview Notes at WC-0213, WC-0217).) Overall, because Plaintiff's answers were so brief, Hoffman found it difficult to accurately assess her true thoughts about the interview questions. (Kjellberg-

Nelson Aff., Ex. F (Hoffman Dep. at 90).)

Hoffman also testified about an answer that Pribyl gave in response to a question asking about job barriers that have prevented her from performing as effectively as she would like. Plaintiff responded that, as a woman, she has had trouble going to the bathroom while wearing her duty belt. (*Id.* at 85–89; Jeanetta Aff., Ex. J. (Interview Notes at WC-0213–18).) An officer's duty belt is used to carry a gun, badge, and radio, among other things. (Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 86).) Pribyl's answer stood out to each interviewer, as reflected in their interview notes, and as reflected in their testimony or sworn statements. (*Id.* at 85–86; Anselment Aff. ¶ 5; [Doc. No. 33]; Brown Aff. ¶ 5 [Doc. No. 34].) Captain Anselment found that Plaintiff's answer suggested a lack of seriousness on her part, and that she did not take the opportunity to "impress the interview panel with her responses." (Anselment Aff. ¶ 5.) Brown characterized the answer as "odd." (Brown Aff. ¶ 5.) Hoffman also expressed concern that the answer was brief and did not outline how the barrier prevented Plaintiff from doing her job effectively. (Kjellberg-Nelson Aff., Ex. F. (Hoffman Dep. at 88).)

Overall, each interviewer concluded that Plaintiff's performance in the interview was not as good as the performance of other applicants. Brown stated that she "did not feel that Plaintiff performed very well during her interview." (Brown Aff. ¶ 4.) Anselment expressed concern over Plaintiff's short answers and concluded that "there were several candidates, including Drew Scherber, who performed better than Plaintiff during the interview." (Anselment Aff. ¶¶ 4, 6.) Hoffman also expressed concern with Plaintiff's brevity in response to questions. (Kjellberg-Nelson Aff., Ex. F. (Hoffman Dep. at 84–93).)

Plaintiff testified that she admittedly gave short answers, which she does when she is nervous. (*Id.*, Ex. B (Pribyl Dep. at 52).) Plaintiff testified she was "very nervous" during the interview. (*Id.*)

### 4. Recommendations Made to Sheriff Hagerty

After completing the interviews, the interviewer panelists exchanged their opinions over which candidates had performed best. (*Id.*, Ex. F (Hoffman Dep. at 64–65; 111–12).) Each panelist identified their five top candidates, and while there was significant overlap, the top five candidates were not identical. (*Id.*) No panelist identified Plaintiff as one of their top five candidates. (*Id.* at 66; Anselment Aff. ¶ 7; Brown Aff. ¶ 7.) Both Hoffman and Anselment recommended Drew Scherber for the position, but Brown did not. (Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 66); Jeanetta Aff., Ex. K (Consensus Notes/Command Staff Recommendations at WC-0323).) The panelists ultimately reached consensus on a group of five applicants, which included Scherber, but not Plaintiff. (Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 111).)

### 5. Sheriff Hagerty's Decision

Sheriff Hagerty testified that although he might have had the authority to consider candidates in addition to those recommended by the interviewing panel, he did not do so in this case because he was satisfied with the quality of the finalists. (Jeanetta Aff., Ex. B (Hagerty Dep. at 37, 50–51).) Because he did not expand beyond the pool of recommended applicants, he did not consider Plaintiff in his decision-making process for the sergeant position. (*Id.* at 48.) After the panel gave him the five recommended applicants' names, Sheriff Hagerty considered each of them, whittled the list down to three finalists, and

discussed them with his Command Staff, taking their comments into consideration as well. (*Id*. at 27, 33.)  Ultimately, Sheriff Hagerty selected Drew Scherber for the position, (*id.* at 27–28), finding him to be a strong supervisor, trustworthy, independent, a good communicator, a consensus builder, and a person who could anticipate Hagerty's informational needs.  (*Id.*)

After Plaintiff was not selected for the promotion, she asked Sheriff Hagerty for advice on what she needed to do to be promoted to Sergeant. (Jeanetta Aff., Ex. L (Hoffman Dep., Ex. 14, email from Hagerty to Hoffman at WC-3622).)  Sheriff Hagerty told Plaintiff that "the qualities [he] seek[s] in applications [are] good attitude, attendance, experience, personality specific to the position etc. and interviews by panel and round table . . . " (ellipsis part of the original quote). (*Id*.) In his deposition, Sheriff Hagerty stated that Plaintiff had a good attitude, and had a good record of attendance "other than what happens with people when you have a child, you're gone." (*Id.*, Ex. A (Hagerty Dep. at 58).) Elaborating on this point, the Sheriff stated in his deposition:

> A.  * * * A lot of women we've had are childbearing age. They'll have a child and then take the 12 weeks off, which is fine. Sometimes they don't come back. They want to raise their child and I get that. I also tell them, when you're done raising the child, come back, the door is open for you. We had two leave at one time. Fantastic cops. One just got out of the business.

(*Id.* at 85.)

> A.  * * * [One of the women who had recently left] worked right up until the day went [sic] in to deliver the baby. I anticipated that she probably wasn't coming back and she hasn't.
>
> Q. Why did you anticipate that?
>
> A. Just through experience. First child – it happened in Buffalo before with

another female officer. She had a baby, let the Family Medical Leave run
and then decided they were going to stay home.

(*Id*. at 86.)

## B. Procedural Background

On March 22, 2017, Plaintiff brought this suit alleging that Wright County engaged
in gender discrimination by not selecting her for the sergeant's position and selecting a
less-qualified male candidate instead. (Compl. at 1 [Doc. No. 1].) Pribyl alleges violations
of both Title VII of the Civil Rights Act of 1964 ("Title VII") and the Minnesota Human
Rights Act ("MHRA"). (*Id.*) The parties have engaged in extensive discovery, including
interrogatories, multiple depositions, and the production of documents.

## III.   DISCUSSION

### A. Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the
moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court
must view the evidence and the inferences that may be reasonably drawn from the evidence
in the light most favorable to the nonmoving party. *Enter. Bank v. Magna Bank of Mo.*, 92
F.3d 743, 747 (8th Cir. 1996). However, "summary judgment procedure is properly
regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal
Rules as a whole, which are designed to secure the just, speedy, and inexpensive
determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of
material fact and that it is entitled to judgment as a matter of law. *Id*. at 323; *Enter. Bank*,

92 F.3d at 747. A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256 (1986).

Defendant moves for summary judgment, arguing that no genuine issues of material fact are in dispute. Wright County asserts that there is no direct evidence of discrimination and Pribyl cannot establish discriminatory animus, nor overcome the legitimate non-discriminatory reasons that the county has identified for not selecting Plaintiff for the sergeant position. (Def.'s Mem. Supp. Mot. for Summ. J. at 1–2.) Rather, Defendant contends that it provided lawful reasons for deciding against Plaintiff for the position. (*Id.*) Further, Wright County maintains that there is no evidence showing that the stated reasons were mere pretext for unlawful discrimination. (*Id.*)

Plaintiff, however, argues that she has identified direct evidence of discrimination. (Pl.'s Opp'n at 23–24 [Doc. No. 38].) She states that strong evidence links her answer to the interview question about barriers to the County's decision to deny her a promotion. (*Id.* at 24.) Pribyl notes that the interviewers found fault with her answer, which Sheriff Hagerty later characterized as "flippant," when he learned of it. (*Id.*) She contends that Defendant's explanation for not promoting her is unworthy of credence. Moreover, Pribyl asserts that she has established pretext because she was objectively more qualified for the position than Scherber, (*id.* at 24), and "the only thing standing in her way" was her gender. (*Id.* at 25.) She therefore contends that genuine issues of material fact preclude summary judgment and Defendant's motion should therefore be denied. (*Id.* at 28–31.)

### B. Sex Discrimination

As noted, Plaintiff's sex discrimination claims arise under the MHRA, Minn. Stat. § 363A et. seq., and Title VII, 42 U.S.C. § 2000e. The MHRA and Title VII, as amended by the Pregnancy Discrimination Act, prohibit sex discrimination on the basis of sex, which includes pregnancy and childbirth. Minn. Stat. § 363A.03, subd. 42; Minn. Stat. § 363A.08, subd. 2; 42 U .S.C. § 2000e(k). Sex discrimination claims under Title VII and the MHRA are analyzed under the same framework, *Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 809 (8th Cir. 2007) (citations omitted), and may be analyzed simultaneously, *Roberts v. Park Nicollet Health Servs*., 528 F.3d 1123, 1127 (8th Cir. 2008) (citing *Bergstrom-Ek v. Best Oil Co*., 153 F.3d 851, 857 (8th Cir. 1998)). The Court therefore relies on decisions under Title VII in analyzing Plaintiff's MHRA claim. *See Allen v. Bridgestone/Firestone, Inc*., 81 F.3d 793, 795–96 (8th Cir. 1996) (noting that courts may look to federal cases interpreting analogous federal anti-discrimination statutes for guidance in cases arising under state anti-discrimination statutes) (citation omitted).

A plaintiff may establish an unlawful employment practice by demonstrating that sex was a "motivating factor" for any employment practice, even though other factors also motivated the practice. 42 U.S.C. § 2000e–2(m). A plaintiff asserting a claim of sex discrimination must present direct evidence of discrimination or provide indirect evidence from which discrimination may be inferred. *Elam v. Regions Fin. Corp*., 601 F.3d 873, 879 (8th Cir.2010) (citations omitted) (addressing claims brought under the PDA, Title VII, and an analogous Iowa civil rights statute).

### 1. Direct Evidence

Direct evidence of discrimination is evidence that clearly shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 860 (8th Cir. 2009) (quoting *Russell v. City of Kansas City*, 414 F.3d 863, 866 (8th Cir. 2005)). The "direct" aspect of such evidence "refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1044 (8th Cir. 2011). To be considered direct evidence, such evidence must consist of "conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Rivers-Frison v. Se. Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir. 1998).

Plaintiff argues that "strong evidence" links her response to the interview question regarding physical barriers with the interview panelists' reaction and Defendant's employment decision. (Pl.'s Opp'n at 24.) The Court disagrees. The challenges surrounding the need to remove a duty belt to use the bathroom are not limited to women. (*See* Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 86).) Moreover, it was Plaintiff herself who introduced the issue of officers' bathroom challenges—not the interview panelists, who asked no gender-specific questions. Nor is there evidence in the record to support an inference that the panelists' negative reaction to her answer was based on a discriminatory

attitude.  Rather, they uniformly found it an "odd" response. By her own admission, Pribyl interpreted the question narrowly, as she thought it concerned actual physical barriers.  (*Id.*, Ex. B (Pribyl Dep. at 56).)

Pribyl also argues that Sheriff Hagerty's subsequent characterization of her answer as "flippant," along with his purported views regarding "the ability of female officers of childbearing age to commit to longevity in their career," constitute direct evidence of discrimination.  (Pl.'s Opp'n at 24.)  The Court disagrees.  Hagerty's subsequent characterization of Pribyl's answer is insufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the decision not to promote Pribyl. First, Hagerty was not one of the initial interview panelists and only learned of Pribyl's interview response, in the context of an internal grievance proceeding that Pribyl had initiated, *after* making the decision to promote Scherber.  (*See* Kjellberg-Nelson Aff., Ex. C (Hagerty Dep. at 46–47).) The Sheriff's after-the-fact characterization of Plaintiff's interview response played no role in the actual employment decision.[3]

Moreover, Sheriff Hagerty explained that he considered Pribyl's answer flippant because "If I'm interviewing for a job, I'm going to be serious about it.  If I'm asked a question, what do you see as your challenges, I'm probably going to hit on the things the

_____

[3] Plaintiff also asserts that Hagerty's decision about whom to promote was not limited to the recommendations made by the interview panel and that he could have selected Pribyl for the position.  (Pl.'s Opp'n at 17.)  But Hagerty testified that while he might have been able to select additional candidates for consideration if he were dissatisfied with the interview panel's recommendations, he had never done so.  (Jeanetta Aff., Ex. A (Hagerty Dep. at 37).)  The Court finds no direct evidence of discrimination in Sheriff Hagerty's decision to consider the panel's recommended applicants.

supervisor has challenges with, employees running the shifts, relationships.  Those types

of things."  (*Id.* at 47–48.)  This explanation demonstrates no gender animus.

In addition, Hagerty's deposition testimony about the departure of female officers

from the Sheriff's Office does not constitute direct evidence of gender bias.  Again, Pribyl

was not among the group of finalists that Sheriff Hagerty considered for the position.  In

response to a deposition question apparently about the representation of female officers in

the Sheriff's Office, Sheriff Hagerty stated:

> A:  We're trying to recruit.  A lot of women we've had are childbearing age.
> They'll have a child and then take the 12 weeks off, which is fine.  Sometimes
> they don't come back.  They want to raise their child and I get that.  I always
> tell them, when you're done raising the child, come back, the door is open
> for you.  We had two leave at one time.  Fantastic cops.  One just got out of
> the business.

(*Id.* at 85.)  He also described an officer who, after becoming pregnant and consulting with

her doctor, "decided she should probably come off the road."  (*Id.* at 85–86.)  Sheriff

Hagerty stated that the employee then worked in dispatch until she delivered her child.  (*Id.*

at 86.)  Hagerty anticipated that she would not return to the Sheriff's Office, and she did

not.  (*Id.*)  When asked why he anticipated this, he testified, "Just through experience.  First

child—it happened in Buffalo before with another female officer.  She had a baby, let the

Family Medical Leave run out and then decided they were going to stay home."  (*Id.*)

This testimony, taken after the adverse action here, made by a person who did not

interview Plaintiff, merely reflects Hagerty's experience of losing female officers on

maternity leave.  Under these facts, it does not reflect bias relevant to Plaintiff.  In fact,

Sheriff Hagerty testified that he encourages pregnant women to return and has

accommodated female officers' pregnancy-related duty assignments. The five candidates advanced by the interview panel were all male, therefore Sheriff Hagerty did not deny the promotion to a candidate on maternity leave, nor is there any evidence that Pribyl was recently on leave or facing an upcoming leave at the time she applied for the job. Nor does Plaintiff explain how Sheriff Hagerty's views on maternity leave impacted the interview panel's determination. These facts do not support a finding by a reasonable factfinder that a discriminatory attitude more likely than not motivated the decision not to promote Plaintiff.

Because the Court finds no direct evidence of discrimination, it proceeds to analyze Pribyl's indirect evidence.

### 2. Indirect Evidence

When a plaintiff lacks direct evidence of discrimination, as is the case here, courts follow the familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), to analyze indirect evidence of discrimination. *See Wierman v. Casey's General Stores*, 638 F.3d 984, 993 (8th Cir. 2011). Under the *McDonnell Douglas* framework, the plaintiff initially must establish a prima face case of discrimination, demonstrating that: (1) she is a member of a protected group; (2) she was qualified for her position; (3) she suffered an adverse employment action; and (4) there are facts that give rise to an inference of unlawful gender discrimination. *Shaffer v. Potter*, 499 F.3d 900, 905 (8th Cir. 2007) (citations omitted). The burden of production then shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its actions. *Id.* If the defendant meets that minimal burden, the burden shifts back to the

plaintiff to rebut the defendant's proffered reason with sufficient "admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive," even if the plaintiff's evidence does not directly disprove the defendant's proffered explanation. *Wierman*, 638 at 995 (citations omitted). The burden of establishing pretext is more onerous than the burden of establishing a plaintiff's prima facie case and requires more substantial evidence "because unlike evidence establishing the prima facie case, evidence of pretext and discrimination is viewed in light of the employer's justification." *Sprenger v. Fed'l Home Loan Bank of Des Moines*, 253 F.3d 1106, 1111 (8th Cir. 2001).

### a. Legitimate Non-Discriminatory Reason

Assuming, without deciding, that Pribyl has presented sufficient indirect evidence to support a prima facie case of gender discrimination, Wright County has offered a legitimate, non-discriminatory reason for not promoting her based on her interview performance. Because the panel found that Pribyl's interview performance was not as strong as other applicants, they did not advance her as a candidate for Sheriff Hagerty's consideration. (*See* Anselment Aff. ¶¶ 4–7; Brown Aff. ¶¶ 4–7.) The Eighth Circuit has found that prospective employers are entitled to compare the respective performances of job applicants during interviews. *Tyler v. Univ. of Ark. Bd. of Tr.*, 628 F.3d 980, 988 (8th Cir. 2011). The Court thus finds that the County has offered a legitimate, non-discriminatory reason for its decision.

### b. Pretext

### 1. Qualifications

As Defendant has met its minimal burden of establishing a legitimate,

nondiscriminatory basis for not selecting Pribyl for promotion, the burden shifts back to Pribyl to raise a genuine fact issue as to whether Defendant's justification was pretextual. Again, the burden of establishing pretext requires more substantial evidence than required to establish a prima facie case, as evidence of pretext and discrimination are viewed with reference to the employer's legitimate, nondiscriminatory justification for the adverse employment action. *Sprenger*, 253 F.3d at 1111. A plaintiff may demonstrate pretext by: (1) rebutting the factual basis underlying the explanation, demonstrating that it is "unworthy of credence"; or (2) showing that the employer's proffered explanation was not the true reason for the adverse employment action, but that an impermissible motive likely motivated the employer's action. *Fiero v. CSG Sys., Inc.*, 759 F.3d 874, 878 (8th Cir. 2014) (citing *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 873 (8th Cir. 2008)). To survive summary judgment, Plaintiff must identify evidence creating a fact issue as to whether Defendant's proffered justification was not simply pretextual, but was "a pretext for discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 777 (8th Cir. 1995) (emphasis in original).

Plaintiff argues that she has met her burden of demonstrating a fact question as to pretext, identifying the following facts: (1) a comparison of her objective qualifications and education against Scherber's shows that she was the more qualified candidate; (2) under a "cat's paw" theory of liability, the gender-based subjective perceptions of the interview panelists infected the decision-making process; and (3) Defendant's reasons for denying her the promotion have shifted over time. (Pl.'s Opp'n at 24–31.)

As to the objective qualifications of Plaintiff and Scherber, Plaintiff asserts that

because she was objectively more qualified than Scherber, she should have received the promotion, and "the only thing standing in her way" was her gender.  (*Id.* at 25.)  "Where. . . the employer contends that the selected candidate was more qualified for the position than the plaintiff, a comparative analysis of the qualifications is relevant to determine whether there is reason to disbelieve the employer's proffered reason for its employment decision."  *Torgerson*, 6432 F.3d at 104 (citation omitted).

Pribyl received the highest NeoGov score of all applicants for the position, but the Sheriff's Office used NeoGov simply to screen applicants to determine if they met the minimum qualifications for an interview.  (*See* Jeanetta Aff., Ex. B (Hoffman Dep. at 33–35).)  Furthermore, it is unclear whether the NeoGov percentage signified that applicants with higher scores answered the NeoGov questions better than others.[4]  In any event, candidates were not ranked based on the percentages, as Hoffman explained, "They weren't ranked.  You either passed or you failed.  You either got an interview or you didn't. . . . 99.9% of the people that apply for a supervisor position get the interview.  If you're a deputy nowadays, you meet the minimum qualifications for sergeant."  (*Id.* at 35.)  And while the form included supplemental questions, the questions asked for standard job application information such as the number of years of experience, highest educational

---

[4] Hoffman testified that he did not know why the NeoGov software would not simply indicate pass/fail, rather than assign a percentage, stating, "This is an HR software.  You'd have to ask them."  (Jeanetta Aff., Ex. B (Hoffman Dep. at 34).)  The Court notes that Defendant submitted a second affidavit from Wright County Human Resources Representative Brown [Doc. No. 43], filed in support of Defendant's Reply Memorandum.  While the Court does not typically consider materials submitted with reply memoranda, the information in question merely confirms the record evidence, and therefore the Court need not consider it.

level, whether the applicant qualified for a veteran's preference, whether the applicant met the minimum requirements, and whether the applicant understood the requirement of answering all of the questions on the form. (*See, e.g.*, Kjellberg-Nelson Aff., Ex. K (Scherber NeoGov App. at WC-1299).) The evidence in the record does not support an inference that Pribyl's higher NeoGov percentage meant that she was a better qualified candidate.

Granted, Pribyl possessed a higher educational degree than Scherber, had been with the Sheriff's Office for seven months longer than Scherber, and had approximately three more years of law enforcement experience. As this Court has acknowledged, however, a higher degree does not necessarily mean that an applicant is more qualified for a position, *See Johnson v. City of Blaine*, 970 F. Supp. 2d 893, 915 (D. Minn. 2013) (finding no evidence of pretext in selection of two male candidates for sergeant position where female candidate had a more advanced degree, as only a two-year degree was required for the promotion and plaintiff made inappropriate comments in interview). As to experience, the Court finds that the seven-month difference in tenure with the Sheriff's Office is negligible, and while Pribyl appears to have had slightly more overall law enforcement experience than Scherber—approximately 20 years versus 17 years[5]—the difference was minor. In

[5] Pribyl became a licensed peace officer in 1994. (Jeanetta Aff., Ex. E (Pribyl NeoGov App. at WC-1284.) Scherber's NeoGov form does not indicate when he became licensed, therefore, for purposes of comparison, the Court assumes that he received his license in 1997, the same year that he began working as a Deputy Sheriff for Wright County. (*See* Kjellberg-Nelson Aff., Ex. K (Scherber NeoGov App. at WC-1297.) However, he may have obtained the peace officer license earlier than 1997, in which case, the difference in years of experience would be even less.

response to a NeoGov form question about years of experience as a licensed peace officer, both Pribyl and Scherber responded identically, stating that they each had "10 years or more" experience. (*Compare* Jeanetta Aff., Ex. E (Pribyl NeoGov App. at WC-1285) *with* Kjellberg-Nelson Aff., Ex. K (Scherber NeoGov App. at WC-1299).) Although Pribyl asserts that her court security background made her better qualified for the position than Scherber, the position did not require such background. Rather, the County required an associate's degree in criminal justice or law enforcement, a valid full-time Minnesota Peace Officer license, the rank of 1st Grade Wright County Deputy, no criminal history, and firearms certification. (Kjellberg-Nelson Aff., Ex. H (Job Posting for Sergeant Position at WC-1199).)

Plaintiff also contends that Defendant ignored her communication skills, the security plans that she had developed, and positive supervisory feedback that she had received. While Pribyl believes that the interviewers overlooked her superior communication skills, she does not point to any specific evidence. Instead, the record evidence shows that the interview panel *did* consider her communication skills, finding them lacking. Hoffman testified that Pribyl's responses to certain questions appeared to be rehearsed or memorized, as when she quoted the Office's mission statement verbatim, in response to the question, "*In your own words*, describe the mission of the Sheriff's Office." (Jeanetta Aff., Ex. B (Hoffman Dep. at 84); Kjellberg-Nelson Aff., Ex. J (Interview Notes at 155, 159) (emphasis added) (listing question and noting, by Hoffman and Anselment, that Pribyl recited the Office's mission statement).) In addition, both Hoffman and Anselment found that Pribyl's answers were short and non-expansive,

(Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 85); Anselment Aff. ¶ 4), and all the interviewers found that she gave an "odd" response to the question about overcoming barriers. (Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 85–88); Anselment Aff. ¶ 4; Brown Aff. ¶ 5.) Hoffman testified that in comparison, Scherber's response to the mission-statement question was better than Pribyl's, as it was not a "textbook answer," and "he did a better job expounding" on the question. (Jeanetta Aff., Ex. B (Hoffman Dep. at 93).)

Regarding the security plans that Plaintiff claims to have developed, she was unaware of whether the County Board had ever approved them. (Kjellberg-Nelson Aff., Ex. B (Pribyl Dep. at 44).) And as to whether Defendant ignored Plaintiff's positive supervisory feedback, the interview panelists did not solicit supervisory feedback for any of the candidates interviewed. (*Id.*, Ex. F (Hoffman Dep. at 55–56).) In short, the differences between the objective qualifications of Pribyl and Scherber were not so great as to create a material issue of fact as to pretext. *See Tyler*, 628 F.3d at 988 ("In sum, even with the most generous view of Tyler's qualifications, the two candidates had relatively similar qualifications, which does not create a material issue of fact as to pretext.") Because many of the objective qualifications of Pribyl and Scherber were comparable, and the County "offered a legitimate business consideration to justify the use of the subjective criteria of which personality was a better fit for the job," *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 858 (8th Cir. 2003), the panel's subjective considerations in this case do not give rise to an inference of pretext for discrimination.

## 2. Cat's Paw Liability

Pribyl argues that under a "cat's paw" theory of discrimination liability[6], there is a disputed issue of fact as to whether the bias of the interview panelists infected the sheriff's ultimate decision. (Pl.'s Supp'l Mem. at 1–2 [Doc. No. 49].) In employment discrimination cases, "'cat's paw' refers to a situation in which a biased subordinate, who lacks decision-making power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Qamhiyah v. Iowa State Univ. of Sci. & Tech.*, 566 F.3d 733, 742 (8th Cir. 2009) (quoting *EEOC v. BCI Coca-Cola Bottling Co. of L.A.*, 450 F.3d 476, 484 (10th Cir. 2006)). Plaintiff asserts cat's paw liability in support of her position that the County's stated reason for not promoting her was pretext for gender discrimination. (*See* Pl.'s Opp'n at 24–28). As a threshold matter, there must be some evidence of gender bias on the part of the interview panelists to impute that Sheriff Hagerty was the duped decisionmaker.

Pribyl concedes, however, that the facts here do not present "a classic 'cat's paw'

---

[6] As the Eighth Circuit has noted,

> [t]he term 'cat's paw' derives from a fable conceived by Aesop, put into verse by La Fontaine in 1679, and injected into United States employment discrimination law by Posner in 1990. *See Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). In the fable, a monkey induces a cat by flattery to extract roasting chestnuts from the fire. After the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing.

*Staub v. Proctor Hosp.*, 131 S. Ct. 1186, 1190 n.1 (2011) (imputing liability to a company where non-decision-makers "took the actions that allegedly caused [the decisionmaker] to fire [the employee].").

scenario." (Pl.'s Supp'l Mem. at 2.) Nonetheless, she argues that while it is "unclear" who had the ultimate decision-making authority, she posits two possibilities: (1) Sheriff Hagerty lacked authority to veto the panelists' recommendations, in which case the panelists were the ultimate decisionmakers who rejected Plaintiff; or (2) Sheriff Hagerty had the authority to reject the panelists' recommendations and select any candidate, in which case, his views on women in the workplace were critical to the promotion decision here. (*Id.*)

Under the facts here, neither of these scenarios supports a cat's paw theory of liability, nor do they create a question of fact as to pretext. Under her first cat's paw scenario, Pribyl argues that a reasonable jury could find that the interview panel was biased in favor of male candidates, intended for the Sheriff to choose a male applicant, and prevented Pribyl from receiving the promotion. (*Id.* at 3.) But as noted earlier, there is no evidence from which a reasonable jury could infer that gender bias was the real reason behind the interview panelists' recommendations. The panelists were entitled to compare the candidates' interview performance. *See Tyler*, 628 F.3d at 989. While courts must scrutinize subjective considerations in hiring and promotion, *Chambers*, 351 F.3d at 858, "the mere use of subjectivity in the hiring process is not itself discriminatory." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1076 (8th Cir. 2011). Again, the interviewers found that Pribyl's answers were not expansive and lacked depth (*see* Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 85); Anselment Aff. ¶ 4) and thought she did not perform well. (Brown Aff. ¶ 4.) Plaintiff herself acknowledged that was nervous in the interview and gave short answers. (Kjellberg-Nelson Aff., Ex. B (Pribyl Dep. at 52).)

As evidence of pretext, Pribyl reasserts that her comment about using the bathroom while wearing a duty belt prompted a discriminatory reaction. (Pl.'s Opp'n at 24.) The Court first notes that the challenges surrounding the need to remove a duty belt to use the bathroom are not limited to women. (*See* Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 86).) Moreover, Plaintiff herself introduced the issue of officers' bathroom challenges— no gender-specific questions were asked. All the interviewers found this response to have been an unusual answer to the barriers question, (*id.* at 85; Anselment Aff. ¶ 5; Brown Aff. ¶ 5), and Hoffman further stated that it lacked any context, explanation, or solution, which he would have expected of a potential supervisor. (Kjellberg-Nelson Aff., Ex. F (Hoffman Dep. at 87–88).) Pribyl argues that she did, in fact, offer a solution in response to the question and Hoffman's testimony to the contrary creates a fact issue as to pretext. But even assuming that Pribyl did offer a solution, no reasonable juror could infer pretext from this minor discrepancy, given all the facts. Hoffman's and Anselment's other criticisms regarding the lack of context and the need for a more complete explanation remain, as do the assessments of all of the panelists that Pribyl's answer was strange.

Also, simply because Anselment interpreted the bathroom comment to mean that Pribyl was not taking the interview seriously, (Anselment Aff. ¶ 5), and Sheriff Hagerty, when he later heard of the response found it "flippant," (Kjellberg-Nelson Aff., Ex. C (Hagerty Dep. at 47–48)), does not show that the County's proffered non-discriminatory reason is unworthy of credence or that a prohibited reason was the likely motivation for not promoting Pribyl. Again, the interviewers unanimously agreed that Pribyl's response to the question was odd and that overall, her answers were short and non-expansive. As

further evidence of alleged bias, Pribyl also points to the fact that Scherber failed to identify any barrier that he had overcome, yet he was advanced as a finalist and ultimately selected for the position. Hoffman testified that Scherber's lack of identified barriers was an appropriate answer for him, since Scherber felt that he had encountered no barriers, and his response was better than "mak[ing] something up." (*Id.*, Ex. F (Hoffman Dep. at 94).)

The Court finds no evidence of bias to support a reasonable inference that Plaintiff's gender was a determinative factor in the panel's decision. The panelists interviewed every applicant who met the minimum qualifications for the position and asked everyone the same questions. They were free to compare how the candidates performed during the interviews, and to find that although Pribyl was certainly qualified for the job, other applicants outperformed her in the interviews. The interviewers' declarations, testimony, and interview notes support their stated reason for not advancing Plaintiff to the next level for the Sheriff's consideration. Nor has Pribyl identified any gender bias on the part of the interviewers outside of the interview setting. While Pribyl has concerns that the Sheriff's Office is male-dominated, (Pl.'s Opp'n at 2–3), she has not demonstrated pretext for gender discrimination. *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) ("[T]he employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.")

Nor is there any evidence showing that the interviewers' purported bias was transmitted to Sheriff Hagerty so as to support a cat's paw theory of liability. The Sheriff

was not involved in the initial interview process, gave the interviewers no guidance regarding the questions, never interviewed Pribyl, nor is there any evidence that he learned about Pribyl's interview performance at the time of the decision-making process. Under these facts, there is no evidence that the subordinates' alleged biases infected Sheriff Hagerty's promotion decision.

The facts also do not support an inference of pretext under Plaintiff's argument that Sheriff Hagerty could have disregarded the interview panelists' recommendations and his own biases tainted the promotion decision. Such a scenario is outside the scope of the cat's paw theory of liability. And, for the reasons noted earlier in the Court's discussion of direct evidence, the evidence regarding Sheriff Hagerty likewise fails to establish pretext.

### 3. Shifting Explanations

Finally, Plaintiff argues that Defendant's shifting explanations for denying her the promotion create a question of fact as to pretext. (Pl.'s Opp'n at 31.) "A change in an employer's legitimate, nondiscriminatory reason for firing an employee is probative of pretext only if the discrepancy is 'substantial.'" *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 958 (8th Cir. 2012) (citation omitted). Pribyl asserts that after she was denied the promotion, Sheriff Hagerty told her that to be promoted, she needed to have a good attitude, attendance, and personality specific to the position. (Pl.'s Opp'n at 31.) Sheriff Hagerty testified that Pribyl asked him "what she needs to do to be a sergeant." (Kjellberg-Nelson Aff., Ex. C (Hagerty Dep. at 50).) Hagerty's suggestions do not constitute a shifting explanation because they were not offered to explain why she did not receive the promotion. Rather, the Sheriff offered his advice in response to her general question.

Pribyl also argues that Defendant's Answers to Interrogatories offer the shifting explanation that employee discipline was a factor in the promotion decision. (Pl.'s Opp'n at 31.) In response to an interrogatory question asking Defendant to identify all the reasons that Plaintiff was denied the promotion, Defendant responded, in relevant part, "Plaintiff was not presented to Sheriff Hagerty as a candidate to even consider by the interview panel. In addition, Sheriff Hagerty was aware of Plaintiff's prior disciplinary history and work performance and did not feel she would be the right fit for the position." (Kjellberg-Nelson Aff., Ex. D (Def.'s Interrog. Ans., No. 16).) Plaintiff contends that her disciplinary history was not a factor, asserting that it constitutes a shifting explanation that supports an inference of pretext. (Pl.'s Opp'n at 31.)

It is true that disciplinary history was not a factor in the initial round of interviews. Defendant has not stated otherwise. (*See* Jeannetta Aff., Ex. B (Hoffman Dep. at 55–56)) (testifying that the interview panel did not consider applicants' disciplinary records). However, Sheriff Hagerty testified that disciplinary history might be pertinent to finalists' candidacies, and he is generally aware of who has been disciplined, especially those with records of serious discipline. (*Id.*, Ex. A (Hagerty Dep. at 64–65).) Of the candidates who interviewed for the position, Plaintiff had received the most serious discipline and was tied with one other candidate (not Scherber) for the most instances of discipline received. (Kjellberg-Nelson Aff., Ex. D (Def.'s Interrog. Ans., No. 18).) Given these facts, the inclusion of disciplinary history in Defendant's interrogatory answer does not constitute a shifting explanation. Had Plaintiff reached the second stage of consideration, Sheriff Hagerty would have considered her disciplinary history in determining whether she was

the right fit for the position.  The Court finds no substantially shifting explanation that would give rise to an inference of pretext.  The interview panel found that Plaintiff did not interview as well as several other candidates, including Scherber.  As a result, Pribyl's candidacy was not advanced to Sheriff Hagerty, the ultimate decisionmaker.  Had her name been advanced, Hagerty was aware of her prior disciplinary history and felt that she was not the right fit for the position.

Accordingly, because Plaintiff has failed to rebut the County's legitimate non-discriminatory explanation for not promoting her, her claims fail.

**THEREFORE, IT IS HEREBY ORDERED THAT**:

1.  Defendants' Motion for Summary Judgment [Doc. No. 29] is **GRANTED**; and

2.  Plaintiff's Complaint [Doc. No. 1] is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  November 19, 2018                                    s/Susan Richard Nelson
                                                                          Susan Richard Nelson
                                                                          United States District Judge