```
1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2
   ------------------------------------------------------------
3                                    )
   Amee Pribyl,                      )   File No. 17-cv-854
4                                    )           (SRN/HB)
          Plaintiff,                 )
5                                    )
   vs.                               )   Saint Paul, Minnesota
6                                    )   June 15, 2018
   Wright County, et al,             )   9:30 a.m.
7                                    )
          Defendants.                )
8                                    )
   ------------------------------------------------------------
9
         BEFORE THE HONORABLE SUSAN RICHARD NELSON
10            UNITED STATES DISTRICT COURT JUDGE
                    (MOTIONS HEARING)
11
   APPEARANCES
12   For the Plaintiff:        KELLY A. JEANETTA LAW FIRM, LLC
                               KELLY A. JEANETTA, ESQ.
13                             402 Union Plaza
                               333 Washington Avenue North
14                             Minneapolis, Minnesota 55401

15                             GENDER JUSTICE
                               CHRISTY L. HALL, ESQ.
16                             Minnesota Women's Building
                               550 Rice Street, Suite 105
17                             Saint Paul, Minnesota 55103

18   For the Defendants:       QUINLIVAN & HUGHES, PA
                               CALLY R. KJELLBERG-NELSON, ESQ.
19                             PO Box 1008
                               St. Cloud, Minnesota 56302-1008
20
     Court Reporter:           CARLA R. BEBAULT, RMR, CRR, FCRR
21                             316 North Robert Street
                               Suite 146 U.S. Courthouse
22                             Saint Paul, Minnesota 55101

23
         Proceedings recorded by mechanical stenography;
24   transcript produced by computer.

25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**


            THE COURT:  We are here this morning in the matter

of Amee Pribyl versus the County of Wright.  This is civil

file number 17-854.  Let's begin by having counsel note your

appearances, please.

            MS. JEANETTA:  Your Honor, I'm Kelly Jeanetta here

on behalf of the Plaintiff, Amee Pribyl.  And with me is

Christy Hall with Gender Justice, also on behalf of the

Plaintiff Amee Pribyl.  Our client was hoping to be here but

Wright County Court Services is experiencing some shortage

of personnel and so she was not able to take the time.

            THE COURT:  Very good.  Good morning.

            MS. KJELLBERG-NELSON:  Cally Kjellberg-Nelson on

behalf of the Defendant, Wright County.

            THE COURT:  We're here today to consider Wright

County's Motion for Summary Judgment.  Ms. Kjellberg-Nelson.

            MS. KJELLBERG-NELSON:  Thank you, Your Honor.

Wright County is requesting summary judgment.  We feel it is

appropriate in this case because there's no direct evidence

of discrimination, as well as Wright County has presented

legitimate nondiscriminatory reasons for not promoting the

Plaintiff in this case and the Plaintiff cannot establish

that those are pretextual.

1          So the first part to understand is that this was a

2     two-part interview process, first with the interview panel,

3     and then they select their top candidates that go to Sheriff

4     Hagerty for consideration.  The important part was that the

5     Plaintiff was never a part of the top candidates for any of

6     the panelists so she was never given as a name to consider

7     by Sheriff Hagerty.  So it's pretty clear that there's no

8     discrimination by Sheriff Hagerty in terms of who he picked

9     out of that top candidate pool.

10          The closest we get to any type of direct evidence

11     of discrimination is Sheriff Hagerty's statements about

12     women going out on maternity leave and not coming back.

13     And, quite frankly, he was simply stating a fact that there

14     have been deputies that have gone out on maternity leave and

15     they haven't come back, but he encourages them to come back.

16     Plaintiff kind of takes the leap that he then takes a dim

17     view of women who go out on maternity leave, that they won't

18     have longevity in their career, but that was nowhere in his

19     testimony.

20          THE COURT:  And Ms. Pribyl wasn't on maternity

21     leave or pregnant, right?

22          MS. KJELLBERG-NELSON:  No, that's not the case we

23     have here.  It was never a concern.  It's quite clear in

24     looking at the candidates he was presented, they were all

25     male candidates.  Obviously, he wasn't weighing whether to

1    pick a female that was on maternity leave or not.  That's

2    not the case we have here.  So we don't have direct evidence

3    of discrimination.

4          So then we go to that burden-shifting analysis and

5    we don't have indirect evidence either.  We admit that the

6    Plaintiff meets that prima facie case in this case, but we

7    have asserted legitimate nondiscriminatory reasons for not

8    promoting Plaintiff, and the first among those is her

9    interview performance.

10          If we go to that interview panel, we look at it,

11    it was a three-person panel.  There's two men from the

12    sheriff's office that were part of the interview panel, and

13    then there's also a female representative from Human

14    Resources, Judy Brown.  And they have taken the deposition

15    of Todd Hoffman, and he quite clearly went through the

16    reasons why he felt like the Plaintiff simply did not

17    perform well in her interview.  She gave very short answers,

18    didn't expand.  He couldn't see her working through the

19    questions.  He just didn't find her to be effective in how

20    she presented.

21          We also have the affidavit of Captain Dan

22    Anselment who was on the interview panel.  He also noted

23    that he didn't feel like Plaintiff performed well in her

24    interview; and that he felt like there were other

25    candidates, including Drew Scherber who was ultimately

1     selected, who performed better than the Plaintiff.

2          And then finally Judy Brown has also submitted an

3     affidavit stating that she just did not feel that the

4     Plaintiff performed well in her interview.

5          In all of those, we don't have any link that their

6     assessment of Plaintiff's performance had anything to do

7     with her gender.  So the closest we kind of get is this

8     response she made to one of the questions, and all of the

9     interview panelists felt like it was an odd response.  So

10    she was asked what is a barrier that prevents you from doing

11    your job, and basically how would you solve that.  Well,

12    she -- the testimony is that -- and she admits she kind of

13    misinterpreted the question and thought that they were

14    talking about physical barriers, so she said, Well, I have

15    to take my duty belt off when I go to the bathroom.  And

16    Todd Hoffman testified that we kind of all paused because we

17    were waiting for, okay, and then what else?  And she

18    didn't -- she never expanded on that answer and that's kind

19    of how it was left.

20         Dan Anselment described her response as being a

21    little flippant.  When Sheriff Hagerty heard about that he

22    felt like it was a flippant response.  Dan Anselment's

23    affidavit states that he felt like she wasn't taking the

24    interview that seriously because this is kind of the time to

25    shine.  This is how you're going to be a supervisor.  As if

1    that truly, as Todd Hoffman said, if that truly was a

2    concern, tell me why and how are you going to solve it as a

3    supervisor.  It's really an opportunity to kind of show what

4    you're going to do if you're going to be a supervisor, and

5    she simply didn't do that, in addition to not really

6    answering the question.

7            But now Plaintiff has tried to make that, Well

8    now, see, they didn't like my response because I identified

9    a gender issue.  And it's a little stretch to say it's a

10   gender issue because men also have to take their duty off,

11   maybe not quite as frequently as women, but they do have to

12   take it off on occasion; and also it doesn't really answer

13   the question of how does that prevent her from doing the

14   job.  As Todd Hoffman explained in his deposition, they have

15   private bathrooms so he wasn't really making the connection

16   for how that prevented her from doing her job.

17           So I believe there's a lot of, you know, support

18   for their panelists' reaction to that response that it

19   simply was just an odd response.  It didn't really fit in

20   and it had nothing to do with gender.  There's really no

21   support that their reaction was in any way linked to the

22   fact that she was identifying an issue as a woman, even

23   though it's not really an exclusively female issue that she

24   faces on the job.

25           So the panel unanimously felt that she didn't do

1    very well in her interview, and all 19 candidates were asked

2    the same questions.  So everyone was given the same ability

3    to answer the same questions.  And we look at the top

4    choices.  They selected the -- their top five, and maybe

5    they weren't all the same for all of them, but it's pretty

6    clear that the Plaintiff wasn't in anyone's top five.

7            So if we look at what the interview panel, how

8    they assessed the interviews, there's no evidence that

9    gender animus ever played a role in their decision.  And so

10   it looks like the interview panel, there's plenty of support

11   that they had legitimate reasons for not selecting Plaintiff

12   as a top candidate to go to Sheriff Hagerty for

13   consideration.

14           So then we get to the issue of whether Plaintiff's

15   education and experience and seniority should have just

16   automatically made her a top candidate.  And I think if we

17   look at the minimum qualification, all 19 candidates met the

18   minimum qualifications, and it's not up to the Plaintiff to

19   decide what is the best strength or what is the best quality

20   that makes her a top candidate.  It's for the employer,

21   Wright County, to decide.  And they have already done that

22   by listing the minimum qualifications and they were

23   certainly within their right to try to assess the candidates

24   in their interview performance, and that's just simply where

25   the Plaintiff fell short in this case.

1           So once it got to Sheriff Hagerty, he had a

2    selection, he remembered just three, and Scherber was part

3    of that; and he thought that Scherber would be a strong

4    leader, someone he could trust, someone that didn't need --

5    because the courts are separate from the actual sheriff's

6    office where the jail and everything is, he wanted someone

7    who could be independent, and he knew that Scherber served

8    on the city council and the school board.

9           So there's really no indication that he was, you

10   know, using gender in any way in his decision when he picked

11   through the three male candidates that he was given.  And,

12   in fact, he testified that he never even asked who were the

13   other people.  He didn't really give any attention to how

14   they performed in their interview.  So he really had no idea

15   anything about how Plaintiff performed in her interview.  He

16   just looked at the candidates he was given and made a

17   selection from there.  And he's identified some unique

18   qualities that he thought would make Scherber the best pick,

19   and there is really nothing to say that those reasons were

20   false in any way or that there was pretext in those.

21          And so for those reasons, Wright County asks for

22   summary judgment and I will just -- if you have any

23   questions?

24          THE COURT:  Well, one question.  The Plaintiff

25   raise the cat's paw theory.  Do you have any response to

1    that?

2              MS. KJELLBERG-NELSON:  Yeah, and I don't know

3    how -- yeah, I did see the cat's paw theory.  I guess they

4    are looking at that in terms of the interview panel.  And I

5    don't see any evidence that any of the three interview

6    panelists exhibited any type of discrimination.  There's

7    nothing about their, you know, how they conducted the

8    interview or how they assessed the interview that even

9    indicates there was any type of gender animus.  So I don't

10   think that's really applicable.  We don't have any real

11   statements or conduct that would even indicate any type of

12   gender discrimination here.  So I don't think we really even

13   get to that kind of analysis because there's just, as I said

14   before, the closest we get is their reaction to her "I have

15   to take my duty belt off" comment, and I just don't think

16   that gets to that level of gender discrimination.

17             THE COURT:  Thanks.

18             MS. KJELLBERG-NELSON:  Thank you.

19             THE COURT:  Ms. Jeanetta.

20             MS. JEANETTA:  Thank you.  The Defendant is

21   arguing in its briefing that the Plaintiff alleges that the

22   subjective component of the interview makes the process

23   discriminatory and that subjectivity of some components

24   cannot in and of itself prove pretext.  The problem with

25   this argument is that there weren't just some subjective

1    components of the promotion decision process.  The decision

2    was made entirely upon subjective determinations.  The

3    entirety of the panelists' decision about who to recommend

4    to the Sheriff had to do with their subject perceptions

5    about defendant's [sic] confidence, how she articulated

6    herself, her body language.

7              THE COURT:  But in order for cat's paw to apply,

8    because, after all, Hagerty is the decisionmaker, let's even

9    suppose that's true that it was entirely subjective.  I

10   don't see any evidence of direct discrimination that might

11   have infused or for which he should be held responsible, you

12   see.

13             MS. JEANETTA:  Well, in a cat's paw situation when

14   you have the decision makers or the people who are infecting

15   the ultimate decision maker -- and that's what happened

16   here, the panelists were infected by discriminatory bias and

17   I'll talk about that in more detail.

18             THE COURT:  Right, and that's a different question

19   than whether they were very good interviewers, isn't it?  In

20   other words, there needs to be evidence among the panelists

21   of discriminatory bias for cat's paw to apply, I believe.

22             MS. JEANETTA:  Well, the discriminatory bias comes

23   from the subjective perceptions, one being the barrier

24   issue.  Detective -- or I'm sorry, Chief Deputy Hoffman, he

25   testified that when Deputy Pribyl talked about what barriers

1    she had experienced and that prevented her from doing her

2    job, he said that she talked about this issue with the duty

3    belt and that she didn't offer any solutions to the problem.

4        The fact of the matter is that she did offer

5    solutions to the problem, and if you take a look at -- if

6    you take a look at -- I'm sorry.  I'm just looking here at

7    the -- in Exhibit J to my affidavit, Pribyl page 0214, Dan

8    Anselment's notes reflect that Plaintiff talked about

9    rethinking or getting a new duty belt is what she said, and

10   Hoffman didn't reflect that she had talked about getting a

11   new duty belt.

12       And then if you take a look at Defendants'

13   affidavit, Exhibit B, Pribyl's deposition pages 57 to 58,

14   she talks about how she had actually recommended during the

15   interview that she get a quick-release belt.  She talked

16   about how the time that it takes to take off a duty belt is

17   very cumbersome and women, in particular, have to remove

18   their duty belts more often than men.  The quick-release

19   belt is something that would allow all of the deputies, all

20   of the officers, to be able to remove their belts quickly

21   and get them back on; and in fact she was provided

22   ultimately a quick-release duty belt.

23       And that is what she talked about in her

24   interview.  That she perceived this barrier.  It was

25   particularly an issue for women, and that -- and she did

1    offer a solution, the solution being a quick-release belt.

2    And she talked in her deposition, and I think that's at --

3    yeah, it's at page 58, about how it is a safety issue given

4    the time that it took to take off the regular more

5    cumbersome belt.

6          So that's one of the pieces of evidence that

7    demonstrates that Hoffman, at least, was not paying

8    attention clearly to what Deputy Pribyl said in her

9    interview process.  He didn't note her comments about the

10   solutions.  He said in his deposition testimony that she

11   didn't offer solutions and in fact she did.

12         By law, subjective decision making in and of

13   itself isn't illegal, per se, but it is something that needs

14   to be closely scrutinized because of the potential for

15   abuse.  And in this case the panelists made absolutely no

16   notes of their assessments of any of the candidates.  All

17   they wrote down in their interview notes was what each of

18   the candidates said, and they didn't even capture all of

19   what Deputy Pribyl said.

20         THE COURT:  But, you know, if you look at the law,

21   what makes this different is that, first of all, there were

22   a set of minimum requirements that everyone had to meet, so

23   that was objective.  And then they were all asked the same

24   question which is also often viewed as a way to ensure

25   fairness in the interview process.

1        So, you know, what people take from that and what

2   they write down is often subjective and I'm not sure that in

3   the presence of minimum requirements being met and the same

4   questions, that the fact that somebody may not have made

5   good notes is probably not going to carry the burden.

6        MS. JEANETTA:  Well, so the minimum qualifications

7   got each of the candidates the interview.  But in this case

8   they didn't base their -- or the evidence suggests that they

9   weren't supposed to be basing their determination solely on

10  whether the candidates met the minimum qualifications.

11  The -- there was this whole e-mail chain, and that's in the

12  record, between Judy Brown and Hoffman whereby they talked

13  about whether or not there should be supplemental questions

14  on the initial application form.

15        They ultimately decided that they would include

16  supplemental questions and those supplemental questions

17  included things like having the applicant acknowledge that

18  they were submitting a resume' in conjunction with their

19  application; asking about their years of experience; asking

20  about their highest level of education; and asking about

21  whether or not there was veteran's preference issue.  They

22  included those supplemental questions in addition to the

23  minimum qualification questions and then, according to the

24  Defendant, just ignored the information that was provided by

25  the supplemental questions.

1          They also are taking the position that that NeoGov

2    rating system where the Plaintiff was rated the highest of

3    all of the candidates who applied for the position had no

4    bearing on anything.  They say that because the candidates

5    were given a chance to interview, none of the ratings, the

6    NeoGov ratings, matter.  But NeoGov rated all of those

7    individual candidates on the basis of both their questions

8    relating to the minimum qualifications, as well as their

9    answers related to the supplemental questions.

10          And there's a fact question here about whether or

11    not and to what extent their answers with respect to the

12    supplemental questions mattered.  If they weren't supposed

13    to matter, why did they include those supplemental

14    questions?  If her education, if her years of experience, if

15    her training, if her certifications weren't supposed to

16    matter, then why did they ask questions about that and why

17    did they need each of the candidates to submit copies of

18    their resume's.

19          The Plaintiff is not arguing that her superior

20    education in and of itself automatically makes her the most

21    qualified, nor is she arguing that her ten years of

22    experience in and of itself is making her the most qualified

23    person, or that her development of policies and practices

24    and certifications and experience specifically in Court

25    Services, she's not saying any of those things in and of

1        themselves make her the most qualified.

2              But where the fact question comes in is when you

3        look at the objective evidence, when you look at the

4        objectivity of what makes Deputy Pribyl more qualified

5        objectively than Drew Scherber and juxtapose that against

6        the Defendants' say-so that the -- it's solely based on the

7        subjective perceptions of the panelists during the

8        interview, that is what creates the genuine fact issue and

9        that is what needs to be examined more closely.

10             THE COURT:  But wouldn't that be more relevant if

11       the panel were making the decision, you see?  In a case like

12       this where you have two levels of interviews and Sheriff

13       Hagerty is the one making the decision, he didn't consider

14       any of that because he wasn't a candidate, you see.

15             MS. JEANETTA:  Sure, sure, but that's where the

16       cat's paw piece comes in.

17             THE COURT:  That's right.  Then come back to that.

18       So in order for cat's paw to apply, there needs to be some

19       pretty clear evidence of direct evidence of discriminatory

20       conduct at the panel level.  It's not the kind of balance

21       that you're talking about that you would engage in if they

22       were the decision makers.

23             MS. JEANETTA:  Right.  Well, if the panelists

24       infected the sheriff's decision --

25             THE COURT:  Right.

1          MS. JEANETTA:  -- with their bias --

2          THE COURT:  Right.

3          MS. JEANETTA:  -- and their bias is something that

4     needs to be explored, as well as their credibility with

5     respect to why they ignored her experience, why did they

6     ignore her training, why did they ignore her certifications,

7     why did they ignore everything when they say that she didn't

8     provide full and complete answers, but we have evidence that

9     the panelists didn't write down all of her answers and

10    Hoffman says that one of her answers didn't even provide a

11    solution when in fact it did.  Those are all things that

12    create a material fact issue about whether or not this panel

13    was infected by discriminatory bias and whether or not

14    the -- that bias infected the Sheriff.

15          Now, aside from the cat's paw issue, in terms of

16    the direct evidence argument, Plaintiff isn't grasping at

17    straws here.  Sheriff Hagerty made assumptions about females

18    who are of child-bearing years.  He assumed that women who

19    have babies are going to use up their FMLA.  They are going

20    to leave and they are not going to come back.

21          THE COURT:  But he didn't have any women to

22    discriminate against.  In other words, in the group that he

23    was considering, there were no women.

24          MS. JEANETTA:  There was one -- no, in the group

25    that he was -- right, in the group that was recommended to

1    him there were no women.  He did testify that he wasn't

2    limited to just choosing from that group that was

3    recommended to him.  He could have gone outside that group

4    but he testified that, you know, he didn't do that.  But,

5    no, that's right.  There weren't any women that were

6    recommended to him by the panel.  The panel recommended --

7             THE COURT:  You know, just looking at the cases,

8    because oftentimes that can really help us figure out where

9    the lines are here, how do you respond to Judge Davis's

10   opinion in the *Johnson* case?

11            MS. JEANETTA:  I'm sorry, I can't respond to that.

12   I'm not familiar with Judge Davis's opinion.

13            THE COURT:  Oh, well, look at page 16 of the

14   opening brief by the defense.  They cite to -- it's *Johnson*

15   *versus City of Blaine*, I believe.  Yes.  Well, if you're not

16   familiar with that case, tell me about cases you are

17   familiar with where these lines are drawn where you have two

18   sets of interviews, if you will, and no real direct evidence

19   that cat's paw still applies.  Give me some law on cat's paw

20   that is similar to this case.

21            MS. JEANETTA:  All right.  I will do my best.  So,

22   as I cited in my brief regarding cat's paw, the *Torgerson*

23   case talked about how --

24            THE COURT:  And did the *Torgerson* case -- tell me

25   a little bit about that.

1          MS. JEANETTA:  Well, I'm sorry, Your Honor, I'm

2     not able to talk about *Torgerson* right off the top of my

3     head.  I apologize for that.

4          THE COURT:  Are you familiar with any law that

5     would support the position you're taking with these set of

6     facts here?

7          MS. JEANETTA:  *Staub versus Proctor Hospital* is a

8     seminal cat's paw case, and in that case the Court said that

9     an employer is liable for the animus or bias of another who

10    has infected the decisionmaking process.  That's what we're

11    arguing here.

12         THE COURT:  Are the facts similar to this case?

13         MS. JEANETTA:  I'm sorry.  I can't tell you off

14    the top of my head.

15         THE COURT:  All right.  I can study them.

16         MS. JEANETTA:  All right.  If you'll just give me

17    a moment?

18         THE COURT:  Sure.

19         MS. JEANETTA:  I want to make sure I cover the

20    bases I wanted to cover.

21         THE COURT:  Yeah.

22         MS. JEANETTA:  All right.  I think I spoke about

23    everything that I wanted to talk about.

24         THE COURT:  I appreciate it.  Thank you.

25         MS. JEANETTA:  Thank you.

1          THE COURT:  You bet.

2          Brief response from the County of Wright.

3          MS. KJELLBERG-NELSON:  Thank you, Your Honor.

4     First of all, just to address the issue of whether the panel

5     was infected by some type of discriminatory animus, we don't

6     have that here.  In fact, Plaintiff in their response noted

7     that Sheriff Hagerty did not give any direction, did not

8     have any conversations with the interview panel about what

9     he was looking for.  They were actually critical of that.

10    So that's evidence that he wasn't trying to infect the

11    process even if he did have some type of discriminatory

12    animus.

13          So that's proof that the panel was acting

14    independently and there's no proof that we have that the

15    panel, in terms of when they are making their assessments of

16    the 19 candidates, that they were making any decisions based

17    on gender.  They were simply assessing the candidates

18    through the same questions they asked all of them.  They

19    weren't tailoring the questions for the men or tailoring the

20    questions for the females.

21          And as you pointed out, that *Johnson versus City

22    of Blaine* case, you know, I always love that when I'm

23    researching cases and I find that one case that really

24    helps, and I get that it's not necessarily precedential but

25    it's a really close scenario where you've got someone

1     applying for a sergeant position.  In that case she had a

2     masters degree and the two men that were selected had only

3     an associates degree, as Scherber had in this case, but that

4     was the minimum qualifications.  And so the fact that you

5     have education and experience alone does not make you the

6     most qualified.  And *Tyler versus University of Arkansas*

7     says that the employers can assess how you perform in an

8     interview.

9            And that's what happened here.  That doesn't mean

10    that it was completely subjective.  We have the -- I think

11    it's the *Amini versus City of Minneapolis* case where the

12    whole thing came down to how the interviewee acted in his

13    interview.  He kind of lost his temper and they had concerns

14    about his temperament.  So employers are most certainly able

15    to assess candidates based on their interview performance

16    and that does not mean it is discriminatory.

17           I haven't really heard anything that would

18    indicate gender.  Maybe they felt like, you know, somebody

19    didn't have the greatest presence.  But I have not heard any

20    evidence that any of those assessments are linked to gender

21    in any way.

22           I want to just briefly touch on that NeoGov

23    because I think it's been shored up pretty clearly in the

24    Second Affidavit of Judy Brown.  Again, she's the Human

25    Resources person that was responsible for putting together

1    that application, the questions.  If you look at the

2    supplemental questions, they are really just addressing --

3    if you look through the e-mails that they submitted, so Judy

4    Brown and Todd Hoffman were going back and forth.  He was

5    saying I'd really like to have someone with five years of

6    experience but the job description says three years.  We'd

7    have to go through a whole process of changing the job

8    questions so just throw on a supplemental question of how

9    many years experience do you have, and that's how they got

10   to that.

11        In the end, what Judy Brown says is for the

12   sheriff's office we interview all the deputies that apply if

13   they meet the minimum qualifications.  We don't pick the top

14   candidates.  So in the end, even if Plaintiff has the

15   highest ranking, that wouldn't have automatically made -- so

16   it would have made her a top pick maybe that goes to the

17   Sheriff if they would have implemented that, but that

18   doesn't mean she would have been chosen.

19        And that's where we get into the discipline

20   history, which didn't necessarily play a role in this

21   because she wasn't one of the top candidates that Sheriff

22   Hagerty would have considered, but that's another legitimate

23   nondiscriminatory reason that Sheriff Hagerty would have

24   had.  If it would have come down to Plaintiff being up there

25   with the other three candidates that he had to chose from,

1    her disciplinary history is so significant that it just -- I

2    don't -- she just wouldn't have been an option for him even

3    if that NeoGov rating would have automatically put her up to

4    the top.

5            And in the end, they still get to -- as Judy Brown

6    said, it was irrelevant.  I know they want to say it made a

7    difference, but the record is pretty clear that it just --

8    they didn't consider it.  They interviewed everyone.  And

9    that's pretty clear by the fact that they interviewed 19

10   candidates.

11           So they were certainly within their rights to

12   assess the performance.  And as we look at that *Johnson*

13   *versus City of Blaine* case, that also had a -- where she

14   kind of made an odd response to a question and that played a

15   factor in their decision to not put her to the top of the

16   candidates.  And in that case the person was 11th out of 12.

17   And they didn't necessarily rank them in this case, but all

18   of the panelists unanimously say she wasn't in my top

19   candidates.

20           So for those reasons I think there's ample

21   evidence that there's no either direct evidence of

22   discrimination or indirect evidence of discrimination and so

23   summary judgment should be granted for Wright County.

24           Thank you.

25           THE COURT:  Thank you.

1          Ms. Jeanetta, anything further?

2          MS. JEANETTA:  Just one or two points.

3          THE COURT:  Sure.

4          MS. JEANETTA:  I want to focus a little bit more

5     on the NeoGov rating.  If you take a look at the Exhibit H,

6     the e-mail exchange between Judy Brown and Todd Hoffman,

7     they talked about -- again, they talked about the

8     supplemental questions.  If the supplemental questions

9     didn't matter, why did they include them?  There's a fact

10    question about whether or not the supplemental question

11    information should have been considered in the panel's

12    determination about who to recommend, and they didn't.  They

13    just disregarded all of Deputy Pribyl's qualifications, her

14    training, her background, her experience.

15          She had been in Court Services for ten years.

16    This was a Court Services sergeant position that she was

17    applying for.  She was the obvious candidate, but the panel

18    chose to ignore the fact that she had the highest NeoGov

19    rating, and I think there's a fact question about why.  Why

20    did they do that?  Why did they include supplemental

21    questions?

22          And then once they saw that their preferred

23    candidates were not the highest rated according to NeoGov,

24    they just decided to ignore the information that was

25    provided in the supplemental question answers.

1          They also chose to ignore her qualifications, her

2     education, her training, her certifications, all of the

3     things that she did while she was in Court Services.

4          And now, now after it's all over, they are saying,

5     Well, gee, we just made our recommendations to the Sheriff

6     based upon her answers in the interview process alone.  And

7     it was so important that, you know, our perception of how

8     she did in that interview, her articulation, her presence,

9     her confidence, all of those things were so important, we

10    didn't even bother to write them down.  We wrote down what

11    she said and we didn't even quite get that right.  But our

12    perceptions of how she did in the interview were so

13    important and the sole basis upon which we decided who to

14    recommend to the Sheriff, we just didn't even write it down.

15    That creates a fact question about their credibility in that

16    regard.

17          I think that's it.  Thank you.

18          THE COURT:  Thank you.

19          All right.  The Court will study this carefully

20    and take it under advisement.

21          Court is adjourned.

22          (Court adjourned at 9:36 a.m.)

23                      *      *      *

24

25

1          I, Carla R. Bebault, certify that the foregoing is

2     a correct transcript from the record of proceedings in the

3     above-entitled matter.

4

5                    Certified by:   s/Carla R. Bebault
                                     Carla Bebault, RMR, CRR, FCRR
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25